UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

DYLONNA MARIA JOHNSON,       )
                                    )
           Plaintiff,          )
                                    )
       v.                 )     No.  4:16 CV 1455 JMB
                                    )
NANCY A. BERRYHILL,[1]        )
Acting Commissioner of Social Security,  )
                                    )
                                    )
          Defendant.      )

## MEMORANDUM AND ORDER

Dylonna Marie Johnson ("Plaintiff") appeals the decision of the Acting Commissioner of

Social Security ("Defendant") denying her application for disability benefits under Title II of the

Social Security Act, see 42 U.S.C. §§ 401 et seq. This matter is fully briefed, and for the reasons

discussed below, the Commissioner's decision will be reversed and remanded.[2]

## I.    Background

### A.    Procedural History

On December 4, 2014, Plaintiff filed an application for disability benefits, arguing that

she was precluded from working due to multiple sclerosis. (Tr. 124-27) Plaintiff alleged a

disability onset date of November 22, 2013. On February 9, 2015, Plaintiff's claims were

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to
Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for
Acting Commissioner Carolyn W. Colvin as the defendant in this suit. No further action needs
to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social
Security Act, 42 U.S.C. § 405(g).

[2] This case is before the undersigned for judicial review pursuant to 42 U.S.C. § 405(g),
with consent of the parties under 28 U.S.C. § 636(c).

denied upon initial consideration.  (Tr. 67-71)  Plaintiff requested a hearing before an administrative law judge ("ALJ") to contest the initial decision.  (Tr. 75-76)  Plaintiff appeared at the hearing (with counsel) on December 22, 2015, and testified concerning the nature of her disability, her functional limitations, and her past work.  (Tr. 31-49, 49-52)  A vocational expert ("VE") also testified in response to the hypothetical questions posed by the ALJ.  (Tr. 49-51)  The VE identified Plaintiff's past work history as an administrative assistant, an insurance customer service representative, a customer service representative, and an appointment clerk.  (Tr. 49)  The VE testified that the hypothetical person could perform Plaintiff's past relevant work in customer service.  The VE further testified that such person could also perform the duties of order caller, mail clerk, and routing clerk.

In a decision dated April 28, 2016, the ALJ found Plaintiff not disabled.  (Tr. 12-25)  Based on the VE's testimony, the ALJ found that Plaintiff was not under a disability within the meaning of the Act because she could return to her past relevant work as a customer service representative. [3]  The ALJ also found Plaintiff could perform the following jobs:  order caller, mail clerk, and routing clerk.  (Tr. 23-24, 246-48)  Plaintiff sought review of the ALJ's decision before the Appeals Council of the Social Security Administration.  (Tr. 1-3)  On August 9, 2016, the Appeals Council denied review.  Therefore, the ALJ's April 28, 2016 decision is the final decision of the Commissioner.  Plaintiff has exhausted her administrative remedies, and her appeal is properly before this Court.  See 42 U.S.C. § 405(g).

In her brief to this Court, Plaintiff nominally raised two issues, the ALJ's Residual Functional Capacity ("RFC") is not supported by "some" medical evidence, and the ALJ's

---

[3] The ALJ found that the record failed to establish the three other jobs identified by the VE would qualify as past relevant work.  (Tr. 24)

hypothetical question failed to capture the concrete consequences of Plaintiff's impairments. Plaintiff's challenges also require consideration of the ALJ's adverse credibility determination. The Commissioner filed a detailed brief in opposition contending that the ALJ's decision is based on substantial evidence.

As explained below, the Court has considered the entire record in this matter. Because the decision of the Commissioner is not supported by substantial evidence, it will be reversed and remanded.

### B. Administrative Hearing Testimony[4]

An administrative hearing in this matter was held on November 22, 2015. (Tr. 31-53) At the hearing, both Plaintiff and the VE testified. Both witnesses were questioned by the ALJ and by Plaintiff's attorney. At the outset of the hearing, Plaintiff's counsel noted no objections to the proposed exhibits, and the ALJ offered Plaintiff the opportunity to move around without asking permission. (Tr. 34)

#### 1) Plaintiff's Testimony (Tr. 35-48)

Plaintiff testified that she lives in a house with her husband and four children, ages 5, 6, 8, and 13. (Tr. 37, 39) Plaintiff's husband works during the day, and with the help of her sister, her husband does most of the housework including the cooking, the laundry, and the shopping. (Tr. 38) Their youngest child has attended daycare since the age of six weeks. (Id.) Plaintiff testified that she spends 20 hours a day in bed, and she has to "[lie] down the majority of the time." (Tr. 37, 39)

Regarding her symptoms and medical treatment, Plaintiff described her disease process

---

[4] The Court has reviewed and considered the entire administrative record. Because this case is being remanded, that record is only briefly summarized herein. Specific aspects of the record are discussed in greater deal in the Court's analysis of the issues presented for review.

as relapse remittent, and that sometimes when she has a hand relapse, she cannot hold or grip anything.  (Tr. 39)  When Plaintiff has a leg relapse, she cannot walk.  (Tr. 40)  Plaintiff explained that she experiences these symptoms one to two times every two months, lasting two to three weeks, and she takes steroids to shorten the duration of her relapses.  (Tr. 41)  Plaintiff also testified that she cannot do anything in the heat.  (Tr. 40)  Plaintiff further testified that she has bladder problems.  (Tr. 41-42)  Plaintiff reported that she has bladder surgery scheduled in December 2015.  (Tr. 42)  A neurologist treats Plaintiff's fatigue and bladder spasms.  Plaintiff also testified that she experiences headaches.  (Tr. 43)  Plaintiff testified that she had optic neuritis resulting in vision loss, but that her vision has been restored and her only complaint was occasional blurriness and difficulty driving at night.  (Id.)  Plaintiff also experiences spasms in her hands and arms.  (Id.)  Plaintiff testified that her medication side effects include vitamin D deficiency and pain.  (Tr. 44)

Plaintiff admitted that her daily activities have, at times, included driving her children to school, trying to clean, helping with homework, and attending church on Sundays.  (Tr. 45-46)  Plaintiff testified that her children help with her personal care.  (Tr. 45)  Although Plaintiff testified that she cannot do a lot of walking, the ALJ noted that Plaintiff reported going to New York for two days in April 2014 and walking everywhere.  (Tr. 46)  Plaintiff testified that a doctor recommended that she exercise so she tried exercising on a treadmill a couple of times but she stopped after throwing up.  (Tr. 47-48)  Her hobbies include reading books.  (Tr. 47)

Plaintiff completed two years of online college, but she quit in May 2013 due to her spasms and flare ups.  (Tr. 50)

When the ALJ inquired into the basis of her fifteen-minute sitting limitation, noting that Plaintiff had been sitting for much longer during the hearing, Plaintiff explained she stayed in her

seat despite the pain.  Plaintiff also testified that she needs to elevate her feet.  (Tr. 51)

2) **Vocational Expert Testimony** (Tr. 49-51, 234-51)

Vocational Expert Delores Gonzalez ("VE"), a vocational rehabilitation counselor, testified regarding Plaintiff's past work, and Plaintiff's current ability to work.  The VE identified Plaintiff's past work as an administrative assistant, an insurance customer service representative, a customer service representative, and an appointment clerk.  (Tr. 49)

In addition to the VE's live testimony at the hearing, the ALJ submitted interrogatories to the VE.  The interrogatories included the following hypothetical question, which incorporated the limitations described in the ALJ's determination of Plaintiff's RFC:

> Assume a hypothetical individual who was born on June 30, 1982, has at least a high school education and is able to communicate in English … and has work experience as described in your response … [regarding Plaintiff's past relevant work]. Assume further that this individual has the residual functional capacity (RFC) to perform light work … except:
> - Change positions every 30-60 minutes as needed while remaining on task
> - Never climb ropes, ladders or scaffolds but occasionally climb stairs
> - Avoid concentrated exposure to extreme temperatures (heat and cold)

(Tr. 247)  The VE determined that such a person would be able to perform Plaintiff's past relevant jobs within the parameters of the hypothetical as well as the following unskilled occupations with jobs existing in the national economy: order caller, mail clerk, and routing clerk.  (Tr. 247-48)

On March 19, 2016, the ALJ sent the VE's interrogatory answers to Plaintiff's counsel and informed him that counsel could submit additional evidence to the VE, submit legal argument, or provide written questions to the expert.  (Tr. 250-51)  The ALJ advised Plaintiff's counsel that if she did not hear from him in ten days, she would assume that he did not wish to request a supplemental hearing, to submit any written statements or records, or to question the VE. (Tr. 251)  In a March 21, 2016, letter, counsel argued that the VE opined that the

hypothetical individual "if allowed to change positions every 30 to 60 minutes while remaining on task, would be capable of all past work, and would also be capable of other unskilled work, but importantly indicates if she required an additional short restroom break on occasion, none of these jobs would be available, and this would represent a significant accommodation." (Tr. 253) Specifically, counsel argued that the VE's response to this additional limitation is consistent with the finding of the treating source, and Plaintiff's significant limitations in her upper extremities would prevent Plaintiff from engaging in sustained work activity and Plaintiff's fatigue, problems with her bilateral hands and arms, headaches, and pain would further erode the available job base. (Tr. 253)

### C.    Forms Completed by Plaintiff

In a Disability Report – Adult, Plaintiff reported stopping work "because of my condition I had to take a lot of time off work for doctor visits and therapy visits. I was on the phone a lot and typed every day and with my condition I had weakness in my hands and could not basically fulfill my duties at work." (Tr. 149)

In a Function Report – Adult, completed on June 30, 2014, Plaintiff reported during a typical day, she wakes up the children, helps them dress for school and then drives them to school, cleans around the house, visits her grandmother and takes her to the store, picks up the children from school and helps them with homework, makes dinner, and then helps the children bathe. (Tr. 160) In response to the question regarding "for whom do you care, and what do you do for them?" Plaintiff answered: "Husband and four children. I do what a wife and mother does. Cook, clean, and take care of kids." (Id.) Plaintiff further explained that her husband helps her take care of the children, and he assists in meal preparation. (Tr. 160-61) Plaintiff reported doing the household shopping four times a month, taking all day. (Tr. 162) Plaintiff

reported reading and cooking as her interests.  (Tr. 163)

**II**.    **Medical Records and Other Records Before the ALJ**[5]

The administrative record before this Court includes medical records indicating that

Plaintiff received health treatment from May 31, 2013, through January 11, 2016.  The Court has

reviewed the entire record.  The following is a summary of pertinent portions of the medical

records relevant to the matters at issue in this case.

A.    **Mercy Hospital St. Louis Emergency Room** (Tr. 257-412)

Between May 31 and July 18, 2013, Plaintiff received treatment on several occasions in

the emergency room at Mercy Hospital St. Louis.

On May 31, 2013, Plaintiff reported having blurred vision with pain, and she received a

supraorbital injection as treatment of an episode of right optic neuritis.  A nurse observed

Plaintiff to have a steady gait.  Plaintiff was not interested in being admitted so she agreed to

make daily visits to the emergency room to receive her intravenous injections for three days.

Plaintiff presented in the emergency room on June 1, 2013, for IV steroid treatment and was

admitted for further work up.  An MRI of Plaintiff's brain showed multiple lesions, supporting a

possible diagnosis of multiple sclerosis.

Plaintiff returned on June 6, 2013, complaining of a headache.  Plaintiff reported that her

other medical problems, including hypertension and multiple sclerosis, were either stable or

improving.

On June 25, 2013, Plaintiff returned for follow-up treatment and denied having any

previous neurological symptoms.  Examination showed Plaintiff has 5/5 strength in her arms and

legs, and finger-to-nose and heel-to-shin coordination was intact.  The emergency room doctor

_____

[5] During treatment on July 29, 2015, Plaintiff reported that she was not currently taking
any medications.  (Tr. 529)

noted Plaintiff had a normal tandem gait and normal heel and toe walking. Based on the MRI results, the doctor diagnosed Plaintiff with multiple sclerosis.

An MRI of Plaintiff's cervical spine completed on July 9, 2013, showed disc disease at C5-C6.

During treatment on July 18, 2013, the emergency room doctor counseled Plaintiff regarding her diagnosis, prognosis, and treatment options for multiple sclerosis. The doctor found Plaintiff had significant exhaustion and generalized weakness related to summer heat and prescribed a cooling vest. The doctor started IV steroid injections. The doctor found Plaintiff's vision had recovered nicely after her episode of right optic neuritis, and noted Plaintiff was able to return to work with no difficulties. Examination showed Plaintiff's strength as 5/5 in her arms and legs, intact finger-to-nose and heel-top shin, and a normal gait.

**B.** **Missouri Baptist Medical Center** (Tr. 419-47, 554-82)

Between August 30, 2013, and November 7, 2015, Plaintiff presented three times to the emergency room at Missouri Baptist Medical Center for treatment.

During treatment in the emergency room on August 30, 2013, Plaintiff reported having dull pressure radiating to her right arm and shortness of breath. On April 10, 2015, Plaintiff complained of left-sided leg spasms, hand weakness, and difficulty ambulating. Plaintiff reported not taking any medications, and last being treated four months earlier, and that her symptoms had improved with IV steroid treatment.

On November 7, 2015, Plaintiff presented in the emergency room, reporting having multiple sclerosis and seeking treatment for her lower extremity numbness. Plaintiff reported having four flare ups in the last year after she started taking Gilenya. A MRI showed no new multiple sclerosis lesions, and her prior lesions were stable compared to a previous MRI

examination.  Plaintiff received a dose of IV steroids.  An examining doctor found Plaintiff was not having a multiple sclerosis flare up.  An MRI of Plaintiff's lumbar spine showed moderate degenerative disc disease at L5-S1 with diffuse bulges.

### C.    Midwest Neurology – Dr. Barry Singer and Heather Popman, NP (Tr. 454-526, 632-36, 652-55)

Between August 26, 2013, and January 21, 2015, Dr. Barry Singer of Midwest Neurology treated Plaintiff.  Between October 17, 2013, and December 21, 2015, Heather Popham, NP, treated Plaintiff's multiple sclerosis.

### 1.    Dr. Barry Singer

On August 26, 2013, Dr. Singer evaluated Plaintiff's vision loss.  Plaintiff reported numbness and tingling in her feet and having vision episodes, and denied having memory loss, fatigue, or depression.  A neurological examination showed Plaintiff to be alert and oriented x3, and her visual acuity 20/20 OS and 20/25 OD corrected.  A physical examination showed Plaintiff had a 5/5 motor strength throughout with normal bulk and tone, and normal finger-to-nose and heel-to-shin testing, and a normal gait.  Dr. Singer opined that Plaintiff's history, examination, and MRI findings were highly compatible with multiple sclerosis and recommended aggressive therapy.

In follow-up treatment on February 17, 2014, Plaintiff reported no hand numbness or weakness, balance mildly off, no bladder urgency, no visual loss, some fatigue, and numbness in her feet.  A neurological examination showed Plaintiff to be alert and oriented x3, visual acuity 20/20, and intact balance and gait.  Plaintiff exhibited normal finger-to-nose and heel-to-shin testing.

On July 15, 2014, Plaintiff returned for multiple sclerosis treatment.  Dr. Singer encouraged Plaintiff to exercise and take the prescribed medications.  Plaintiff reported having

good balance and strength, no tingling or numbness, increased fatigue, no bladder urgency, and no visual loss. A neurological examination showed Plaintiff to be alert and oriented x3, intact gait and balance, and normal finger-to-nose and heel-to-shin testing.

On January 21, 2015, Plaintiff reported having no visual loss, occasional vertigo, good balance, no bladder urgency, and ongoing fatigue. A neurological examination showed Plaintiff to be alert and oriented x3, okay memory, visual acuity, normal balance and gait, normal coordination, and normal finger-to-nose and heel-to-shin testing.

Plaintiff returned for follow-up treatment on August 11, 2015, discussed exercise with Dr. Singer, and reported using a treadmill twice a week. (Tr. 514) Plaintiff reported having good strength, no numbness, no visual loss or double vision, no bladder urgency, and ongoing fatigue. Examination showed Plaintiff had intact balance and normal gait, and normal finger-to-nose and heel-to-shin testing.

On December 19, 2015, Dr. Singer completed a Multiple Sclerosis Medical Source Statement ("MSS"), answering questions regarding Plaintiff's impairments at the behest of counsel. Dr. Singer indicated that Plaintiff's symptoms, including chronic fatigue, weakness, pain, unstable walking, and numbness are all consistent with multiple sclerosis. Dr. Singer indicated that Plaintiff has "significant and persistent disorganization of motor function in two extremities [left hand and arm weakness] resulting in disturbance of gross and dexterous movement or gait and station." (Tr. 632) Dr. Singer noted that Plaintiff has fatigue with walking distances. Dr. Singer listed December 4, 5, and 8, and April 9-11, 2014, and April 13, 16- 17, 2015,[6] as the dates Plaintiff experienced exacerbations of multiple sclerosis, and Dr. Singer opined that these exacerbations would have limited Plaintiff's ability to work. Dr. Singer found

_____

[6] A review of Dr. Singer's treatment records show that Dr. Singer did not treat Plaintiff on any of these dates.

that Plaintiff could walk one block, sit for fifteen minutes, stand for five minutes, and sit and stand/walk for a total of less than two hours in an eight-hour workday. Dr. Singer also found that Plaintiff would have to take unscheduled breaks three to four times a day and rest fifteen minutes before returning to work, and Plaintiff would have to elevate her legs at table level 25% of the time during an eight-hour workday. Dr. Singer found Plaintiff can rarely carry ten pounds, rarely twist, and never stoop or crouch/squat. Dr. Singer next found Plaintiff to be limited in her use of her hands 80% of the workday and in reaching in front of her body. Dr. Singer opined that Plaintiff would miss work more than four days a month.

## 2. <u>Heather Popham, NP</u>

On October 17, 2013, Plaintiff returned for a routine office visit and reported having right hand weakness and no strength to grip, strong legs, good balance, no visual loss, no bladder urgency during daytime, only at night, and moderate fatigue. A neurological examination showed Plaintiff to be alert and oriented x3, optic visual acuity, normal gait, and normal heel-to-shin testing. Ms. Popham provided Plaintiff with an exercise program. Plaintiff returned on October 22, 2013, complaining of left arm weakness.

In follow-up treatment on November 22, 2013, Plaintiff reported increased right hand weakness in the morning but improvement in her right arm heaviness. Plaintiff also reported good balance, okay strength, no visual loss, and no bladder urgency. Ms. Popham noted that Plaintiff had an allergic reaction to second Tysabri infusion and wanted to discuss alternative treatment options. In a December 20, 2013, office visit, Plaintiff reported weakness in her hands and heaviness to her arms, good balance, no visual loss, no bladder urgency, and fatigue. Plaintiff reported being appointed custody and guardianship of a friend's six-month old child and having difficulty completing housework. A neurological examination showed Plaintiff to be

alert, oriented x3, visual acuity, normal gait, and normal finger-to-nose and heel-to-shin testing.

During treatment on April 8, 2014, Plaintiff reported 90% recovery from relapse with some residual numbness around her navel. Plaintiff had recently returned from a trip to New York City where she did a lot of walking and was doing okay but she experienced left leg numbness during her flight which resolved two hours after landing. Plaintiff also reported a few days later after returning from New York, heaviness in her feet, legs weightless, balance off, hands shaky, weak grip, and increased fatigue. Ms. Popham noted that Plaintiff failed to complete blood work and an MRI of brain and cervical spine in March as instructed. A neurological examination showed mostly normal results, with mildly impaired gait and normal coordination.

In follow-up treatment on June 25, 2014, Plaintiff reported difficulty walking due to left knee stiffness and tightness but no fatigue, no visual loss, and no cognitive issues. Plaintiff also reported spasms down her left leg but she had good strength, okay balance, and no numbness to her upper or lower extremities. An neurological examination showed overall normal results.

On November 26, 2014, Ms. Popham encouraged Plaintiff to exercise. Plaintiff reported feeling an internal tremor in her hands, instability, and weakness in her hands and arms but okay leg strength, no numbness or tingling, no visual loss, and no bladder urgency. A neurological examination showed Plaintiff to be alert and oriented x3, memory intact, no motor weakness except mild breakthrough weakness of her upper extremities, normal balance and gait, and normal finger-to-nose and heel-to-shin testing.

On April 13, 2015, Plaintiff reported numbness in her toes bilaterally, increased fatigue, shooting pain in left knee, balance issues, no visual loss, and no bladder urgency. Ms. Popham encouraged Plaintiff to exercise.

In follow-up treatment on September 15, 2015, Ms. Popham encouraged Plaintiff to continue exercising by using her treadmill twice a week. Plaintiff reported left hand/arm weakness with spasms, fatigue when walking longer distances, okay balance, and increased fatigue due to the heat. For example, "[a]fter coming back from the grocery store or going to the park with the kids," Plaintiff is "drained" when she returns home. (Tr. 502) Examination showed a normal gait and balance and normal coordination with finger-to-nose testing.

On December 21, 2015, Plaintiff reported general weakness increasing with activity, severe fatigue, multiple sclerosis, and bladder spasms. Examination showed no motor weaknesses, normal gait and balance, and normal coordination with finger-to-nose and heel-to-shin testing.

D.     **Associated Internists – Dr. Douglas Pogue** (Tr. 539-553)

On September 24, 2014, Dr. Douglas Pogue completed a general medical examination and found Plaintiff was "reasonably in good shape." (Tr. 546) Dr. Pogue recommended eating a low fat diet and exercising three to four days a week to help achieve weight loss and reasonable fitness levels. Dr. Pogue found Plaintiff's multiple sclerosis was in good control.

E.     **Premier Heart Group – Dr. Leslie Mezei** (Tr, 583-620)

On December 18, 2012, Plaintiff sought cardiac clearance so she could serve as a surrogate mother. Plaintiff reported being off all of her medications and exercising each day for thirty minutes on the treadmill. Dr. Leslie Mezei's examination showed unremarkable results with stable vital signs. Plaintiff denied having any fatigue, weakness, or headaches.

F.     **Urology Consultants, Ltd. - Dr. Travis Bullock** (Tr. 623-31, 657-97)

On October 7, 2015, Dr. Travis Bullock evaluated Plaintiff's overactive bladder. Plaintiff reported urinating every two hours and, on average, nine times each night. Plaintiff reported no

weaknesses, no balance problems, no numbness, and no seizures.  A musculoskeletal examination showed Plaintiff moves all of her extremities well.

In follow-up treatment on December 9, 2015, Plaintiff reported her urinary urgency had improved.  A musculoskeletal examination showed good movement in all extremities.  Plaintiff reported that her symptoms were minimally bothersome.

On December 24, 2015, Dr. Bullock surgically performed a bladder biopsy and diagnosed Plaintiff with a bladder lesion.  On January 11, 2016, after examining Plaintiff, Dr. Bullock found that Plaintiff moved all extremities well.

### G.  Disability Determination Explanation – Kevin Cochran  (Tr. 54-62)

Kevin Cochran, a state agency single decision maker ("SDM"),[7] completed a Physical Residual Functional Capacity Assessment as part of the Disability Determination Explanation. Based on a review of the medical records, the SDM determined that Plaintiff had the capacity to perform light work; occasionally lift or carry twenty pounds; frequently lift or carry ten pounds; and stand or walk about six hours in an eight-hour workday; and sit for about six hours in an eight-hour workday.  Plaintiff was restricted from climbing ladders/ropes/scaffolds and could frequently climb ramps/stairs.[8]

---

[7] Missouri is one of twenty states in which nonmedical disability examiners are authorized to make certain initial determinations without requiring a medical or psychological consultant's signature.  See Office of the Inspector General, Audit Report Single Decisionmaker Model – Authority to Make Certain Disability Determinations without a Medical Consultant's Signature (Aug. 2013).

[8] The opinion of an SDM is not medical opinion evidence, and an ALJ commits legal error if she weighs the opinion of an SDM under the rules appropriate for weighing an opinion from a medical consultant.  Dewey v. Astrue, 509 F.3d 447, 449-50 (8th Cir. 2007).

### III.   **The ALJ's Decision**

In a decision dated April 28, 2016, the ALJ determined that Plaintiff was not disabled under the Social Security Act.  (Tr. 15-25)  Consistent with the VE's testimony, the ALJ found that Plaintiff had the residual functional capacity to perform the requirements of occupations such as an insurance customer service representative, an order caller, a mail clerk, and a routing clerk.  (Tr. 23-25)

In arriving at her decision, the ALJ followed the required five-step inquiry.  The ALJ found that Plaintiff has not engaged in substantial gainful activity since November 22, 2013, the alleged date of disability.  (Tr. 17)  The ALJ determined that Plaintiff has the severe impairments of multiple sclerosis and degenerative disc disease.  (Id.)  The ALJ further determined that, despite her impairments, Plaintiff retained the residual functional capacity ("RFC") to perform light work with the following additional limitations/restrictions:  (1) Plaintiff must be allowed to change positions every 30-60 minutes (i.e. sit/stand option); (2) Plaintiff should never climb ropes, ladders, or scaffolds, but she can occasionally climb stairs; and (3) Plaintiff should avoid concentrated exposure to extreme temperatures (heat and cold).  (Tr. 19)

The ALJ supported her RFC determination with a thorough analysis of the record evidence.  (Tr. 19-23)  The ALJ considered Plaintiff's subjective allegations regarding her symptoms and limitations, but found her not entirely credible.  (Tr. 20, 22-23)  The ALJ thoroughly considered the record evidence regarding Plaintiff's exertional limitations.

The ALJ concluded that, although the position of an insurance customer service representative qualified as past relevant work, the record failed to establish that the positions of a customer service representative, an appointment clerk, and an administrative assistant qualified as past relevant work.  The ALJ further found that Plaintiff also could perform other jobs that

exist in substantial numbers in the state and national economies, including an order caller, a mail clerk, and a routing clerk. (Tr. 25-26) In making her determinations, the ALJ relied on the interrogatory answers of the VE. Accordingly, the ALJ concluded that Plaintiff was not under a disability under the Act. (Tr. 27)

The ALJ's decision is discussed in greater detail below in the context of the issues Plaintiff has raised in this matter.

## IV.    <u>Standard of Review and Legal Framework</u>

To be eligible for disability benefits, Plaintiff must prove that she is disabled under the Act. <u>Baker v. Sec'y of Health and Human Servs.</u>, 955 F.2d 552, 555 (8th Cir. 1992); <u>see</u> <u>also</u> <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001). Under the Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c (a)(3)(A). A plaintiff will be found to have a disability "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do her previous work but cannot, considering [her] age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A) and 1382c(a)(3)(B). <u>See</u> <u>also</u> <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140 (1987).

Per regulations promulgated by the Commissioner, 20 C.F.R § 404.1520, "[t]he ALJ follows 'the familiar five-step process' to determine whether an individual is disabled…. The ALJ consider[s] whether: (1) the claimant was employed; (2) she was severely impaired; (3) her impairment was, or was comparable to, a listed impairment; (4) she could perform past relevant

work; and if not, (5) whether she could perform any other kind of work." Martise v. Astrue, 641 F.3d 909, 921 (8th Cir. 2011) (quoting Halverson v. Astrue, 600 F.3d 922, 929 (8th Cir. 2010)). See also Bowen, 482 U.S. at 140-42 (explaining the five-step process).

The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration." Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)). The ALJ's findings should be affirmed if they are supported by "substantial evidence" on the record as a whole. See Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008). Substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Wildman v. Astrue, 964 F.3d 959, 965 (8th Cir. 2010) (same).

Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The district court must "also take into account whatever in the record fairly detracts from that decision." Id. Specifically, in reviewing the Commissioner's decision, a district court is required to examine the entire administrative record and consider:

1. The credibility findings made by the ALJ.
2. The claimant's vocational factors.
3. The medical evidence from treating and consulting physicians.
4. The claimant's subjective complaints relating to exertional and non-exertional activities and impairments.
5. Any corroboration by third parties of the claimant's impairments.
6. The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Sec'y of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (citation

omitted).

Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011). A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance. Id.; see also McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

## V.   Analysis of Issues Presented[9]

The broad issue in this case is whether the final decision of the Commissioner is supported by substantial evidence on the record as a whole. In her brief to this Court, Plaintiff argues that:  (1) the ALJ adversely assessed Plaintiff's credibility; (2) the ALJ failed to cite to any medical evidence in support of the RFC; and (3) the ALJ erred in adopting the VE's testimony.  As explained below, because the Court concludes that the ALJ erred in finding the RFC was supported by some medical evidence, the Court will only address this issue.

A claimant's RFC is the most an individual can do despite the combined effects of his or her credible limitations.  See 20 C.F.R. § 404.1545.  "The RFC 'is a function-by-function assessment based on all of the relevant evidence of an individual's ability to do work-related activities.' Despite his or her physical or mental limitations."  Roberson v. Astrue, 481 F.3d 1020, 1023 (8th Cir. 2007) (quoting SSR 96-8p, 1996 WL 374184, at *3 (S.S.A. 1996)).  An ALJ's RFC finding is based on all of the record evidence, the claimant's testimony regarding

---

[9] Plaintiff's challenges also require consideration of the ALJ's adverse credibility determination.

symptoms and limitations, the claimant's medical treatment records, and the medical opinion evidence. See Wildman, 596 F.3d at 969; see also 20 C.F.R. § 404.1545; SSR 96-8p (listing factors to be considered when assessing a claimant's RFC, including medical source statements, recorded observations, and "effects of symptoms … that are reasonably attributed to a medically determinable impairment."). An ALJ does not, however, fail in her duty to assess a claimant's RFC on a function-by-function basis merely because the ALJ does not address all areas regardless of whether a limitation is found. Depover v. Barnhart, 349 F.3d 563, 567 (8th Cir. 2003). See also Craig v. Apfel, 212 F.3c 186, 189 (8th Cir. 2000) ("[A]n ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered.").

"[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision." Naber v. Shalala, 22 F.3d 186, 189 (8th Cir. 1994). The Eighth Circuit Court of Appeals has recognized that the ALJ's duty to further develop the record only arises if a crucial issue is undeveloped. Combs v. Berryhill, --- F.3d ---, No 16-2849, slip op. at 7 (8th Cir. Aug. 21, 2017) ("Well-settled precedent confirms that the ALJ bears responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case."); Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2004).

The ALJ determined that, despite her impairments, Plaintiff retained the RFC to perform light work with the following additional limitations/restrictions: (1) Plaintiff must be allowed to change positions every 30-60 minutes (i.e. sit/stand option); (2) Plaintiff should never climb ropes, ladders, or scaffolds, but she can occasionally climb stairs; and (3) Plaintiff should avoid concentrated exposure to extreme temperatures (heat and cold). "According to the regulations,

'light work' is generally characterized as (1) lifting or carrying ten pounds frequently; (2) lifting twenty pounds occasionally; (3) standing or walking, off and on, for six hours during an eight-hour workday; (4) intermittent sitting; and (5) using hands and arms for grasping, holding, and turning objects." Holley v. Massanari, 253 F.3d 1088, 1091 (8th Cir. 2001) (citing 20 C.F.R. § 404.1567(b)).  "[A] job is in this category when it requires a good deal of walking or standing or when it involves sitting most of the time with some pushing or pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).

According to Plaintiff, the ALJ's decision fails to cite to any medical evidence to support its conclusions regarding her ability to handle this RFC.  Plaintiff notes that the ALJ accorded little weight to Dr. Singer's December 19, 2015, MSS, suggesting that Plaintiff had a greatly reduced RFC.  In his MSS, Dr. Singer determined that Plaintiff had a greatly reduced sedentary residual functional capacity that included rarely lifting or carrying ten pounds; standing or walking less than two hours in an eight-hour workday; sitting for less than two hours in an eight-hour workday; shifting positions at will; taking three to four unscheduled breaks for fifteen minutes each time; and elevating her legs at table level for 25% of the workday.  Dr. Singer further opined that Plaintiff was incapable of even low stress work and would be absent at least four times a month.  Plaintiff was restricted from climbing ladders/ropes/scaffolds and could frequently climb ramps/stairs.  Dr. Singer completed the MSS at the behest of counsel and four months after he last treated Plaintiff.  During the five times Dr. Singer treated Plaintiff, Dr. Singer's examination showed Plaintiff had 5/5 motor strength throughout, normal finger-to-nose and heel-to-shin testing and intact gait and balance.  Accordingly, substantial evidence on the record as a whole supports the ALJ's weighing of the physician-opinion evidence on Plaintiff's RFC.  See Johnson v. Astrue, 628 F.3d 991, 994 (8th Cir. 2011) (form consisting of series of

check marks assessing RFC, which is determination for ALJ to make, amount to conclusory opinion that may be discounted if contradicted by other objective medical evidence).

The ALJ noted that the medical records did not support a finding that Plaintiff's degenerative disc disease or multiple sclerosis met a listing requirement or that Plaintiff's multiple sclerosis was of disabling severity.[10]  In support, the ALJ cited to the consistently normal clinical findings showing Plaintiff had full motor strength, with normal bulk and tone, her reflexes were equal throughout, with no indication of Romberg balance impairments, and she had a normal gait.  The ALJ found that Plaintiff "had ongoing treatment with a neurologist for her condition, but the signs from the treatment records fail to show limitations greater than her reduced light residual functional capacity."  (Tr. 22)

The undersigned finds that the record does not contain medical evidence from which a proper determination of Plaintiff's functional limitations can be made.  There is no indication that another physician completed a formal assessment of Plaintiff's functional capacities.  To the extent the ALJ may have considered the SDM opinion evidence because the Physical Residual Functioning Capacity Assessment permits light work and imposed some of the same functional limitations, reliance on the opinion of a nonmedical state evaluator will not, without more, provide substantial evidence in support of the RFC.  See, e.g., Dewey, 509 F.3d at 449-50. (explaining the opinion of an SDM is not medical opinion evidence, and an ALJ commits legal error if she weighs the opinion of an SDM under the rules appropriate for weighing an opinion from a medical consultant).  On remand, a formal assessment of Plaintiff's functional capacities will need to be completed by a physician.

---

[10] The mere fact that a plaintiff has been diagnosed as suffering from a medical condition does not, in and of itself, compel the conclusion that she is disabled.  See Randall v. Astrue, 570 F.3d 651, 658-59 (5th Cir. 2009).

**VI.**    **Conclusion**

The Court's function on review is to determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole and free from legal error. Papesh v. Colvin, 786 F.3d 1126, 1131 (8th Cir. 2015). Where an ALJ fails to properly support the RFC with medical evidence, it cannot be said that the resulting RFC determination is supported by substantial evidence on the record as a whole. Holmstrom v. Massanari, 270 F.3d 715, 722 (8th Cir. 2001). In the instant case, the ALJ failed to support the RFC with some medical evidence. The matter will therefore be remanded for further consideration and, if necessary, for re-evaluation of Plaintiff's RFC.

Although the Court is aware that the ALJ's decision as to non-disability may not change after properly considering all the evidence of record and undergoing the required analysis, the determination is nevertheless one that the Commissioner must make in the first instance. See Pfitzner v. Apfel, 169 F.3d 566, 569 (8th Cir. 1999).

 **IT IS HEREBY ORDERED** that the final decision of the Commissioner denying social security benefits be **REVERSED**, and this cause is **REMANDED** to the Commissioner for further proceedings with this Memorandum and Order.

A separate Judgment shall be entered this day.


/s/ *John M. Bodenhausen*
UNITED STATES MAGISTRATE JUDGE

Dated this 31st day of August, 2017